# EXHIBIT

# A

## Commonwealth of Massachusetts

BARNSTABLE, SS.

TRIAL COURT OF THE COMMONWEALTH
SUPERIOR COURT DEPARTMENT
CIVIL DOCKET NO. 1672CV 487

*Benjamin Ayres* ___, PLAINTIFF(S),

v.

*Cape Cod Academy* DEFENDANT(S)
*& Thomas Trigg*

SUMMONS

TRUE COPY ATTEST
*Brad Parker*   OCT 18 2016

DEPUTY SHERIFF

THIS SUMMONS IS DIRECTED TO *Cape Cod Academy* ___. (Defendant's name)

<u>You are being sued.</u> The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this summons and the original complaint has been filed in the <u>Barnstable Superior</u> Court. YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.

1. **You must respond to this lawsuit in writing within 20 days.** If you do not respond, the court may decide the case against you and award the Plaintiff everything asked for in the complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. If you need more time to respond, you may request an extension of time in writing from the Court.

2. **How to Respond.** To respond to this lawsuit, you must file a written response with the court <u>and</u> mail a copy to the Plaintiff's Attorney (or the Plaintiff, if unrepresented). You can do this by:

   a. Filing your signed original response with the Clerk's Office for Civil Business, <u>Superior</u> Court, by mail or in person to: <u>3195 Main Street, Barnstable, MA 02630</u> ...

   b. Delivering or mailing a copy of your response to the Plaintiff's Attorney/Plaintiff at the following address: <u>Post Office Box 1427, East Dennis, MA 02641</u>

3. **What to include in your response.** An "Answer" is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in court. If you have any claims against the Plaintiff (referred to as **counterclaims**) that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must specifically request a jury trial in your Answer or in a written demand for a jury trial that you must send to the other side and file with the court no more than 10 days after sending your Answer. You can also respond to a Complaint by filing a "Motion to Dismiss," if you believe that the complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under Mass. R. Civ. P. 12. If you are filing a Motion to Dismiss, you must also comply with the filing procedures for "Civil Motions" described in the rules of the Court in which the complaint was filed, available at <u>www.mass.gov.courts/case-legal-res/rules of court.</u>

COMMONWEALTH OF MASSACHUSETTS

Barnstable, ss.

Barnstable Superior Court
Civil Action No. 1672CV484

BENJAMIN W. AYRES II

v.

CAPE COD ACADEMY
THOMAS TRIGG

## VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL

NOW COMES the Plaintiff, Mr. Benjamin W. Ayres II, by and through his attorney, Ms. Jenny L. Margeson, and says as follows in his complaint:

### Parties

1.  Plaintiff Benjamin Ayres (hereinafter referred to as the Plaintiff Ayres) is currently, and was at all times pertinent hereto, a resident of the Commonwealth of Massachusetts. The Plaintiff Ayres had been employed as a librarian by the Defendant CAPE COD ACADEMY (hereinafter referred to as "CCA") since 2008, until the date of his termination at the end of the 2014-2015 school year.

2.  Defendant CCA is an independent educational institution established under the laws of the Commonwealth of Massachusetts, with its school campus located in Osterville, Massachusetts, employing in excess of 50 individuals.

3.  The Defendant Thomas Trigg, (hereinafter referred to as the Defendant Trigg), upon information and belief, is a resident of the Commonwealth of Massachusetts and, at all times pertinent hereto, was Head of School for the Defendant CCA, in which position he had responsibility for the day-to-day operations of the Defendant CCA, including the implementation of all personnel matters, and was a member of the Board of Trustees of the Defendant CCA.

### JURISDICTIONAL AND VENUE ALLEGATIONS

4.  Venue is proper in this Court as the incidents alleged in this Complaint occurred in the Commonwealth of Massachusetts.

5.  This suit is brought and jurisdiction lies pursuant to the Federal Americans with Disabilities Act ("ADA"), the Federal Family and Medical Leave Act ("FMLA"), the Federal Age

1

Discrimination in Employment Act ("ADEA"), and Massachusetts General Law Chapter 151B, all of which apply to public and to private employers. The ADA covers employers with 15 or more employees; the state law, MGL c. 151B covers employers with 6 or more employees.

6. The Plaintiff filed a charge of employment discrimination with the Federal Equal Employment Opportunity Commission and the Massachusetts Commission Against Discrimination alleging violations of the ADA, FMLA, ADEA and MGL c. 151B and has received a Notice of Right to Sue dated August 5, 2016. Further, Plaintiff has filed this action within 90 days of receiving said Notice.

7. The Plaintiff received an Authorization for Immediate Private Suit letter from the Massachusetts Attorney General's Fair Labor Division on September 26, 2016.

## Facts

8. Mr. Benjamin Ayres suffers from diagnosed and treated major depressive disorder and bipolar disorder.

9. Mr. Ayres is a qualified individual with a disability. He suffers from a mental impairment that limits one or more of his major life activities, and he has a significant history of such impairment, and has been treated repeatedly for his condition.

10. Ayres is a 61-year-old man who is a member of two separate protected classes: Age and Disability.

11. Ayres began working for Cape Cod Academy as a fulltime librarian beginning in 2008.

12. During his employment, Ayres never received any discipline from CCA, or any negative reviews, or poor performance evaluations.

13. Ayres worked in the upper school library and at times provided assistance in the lower school library as well.

14. Mr. Ayres's contract was renewed and he was re-appointed as the upper school librarian every year from the 2008-2009 school year through the 2014-2015 school year.

15. At all times relevant hereto, CCA has had, and continues to maintain, a Faculty Handbook, which is updated on an as needed basis and provided to all faculty members.

16. Paragraph X of the 2014-2015 CCA Faculty Handbook covers "CONTRACTUAL DISCUSSIONS" and states, "During late winter the Head of School normally offers to meet individually with every faculty member to discuss professional performance, plans, goals and objectives. You will be notified when these appointments may be made."

17. No such appointment was ever held between Trigg and Ayres.

18. Trigg never observed Ayres working at the school.

19. Trigg never evaluated Ayres's work performance.

20. Paragraph X of the 2014-2015 CCA Faculty Handbook covers "CONTRACTUAL DISCUSSIONS" and states, "Assuming stable or growing enrollment, faculty members can expect renewal of appointment if the following positive factors are evidenced: A high level of professional performance as described in the "Teacher Evaluation and Development" process. Respectful and collegial attitude toward fellow faculty, staff and administration. Active support of school policies. A willingness to participate in the total life of the school community. A level of general conduct - in class and out - which reflects a mature and responsible standard before students, colleagues, and parents."

21. Ayres met and or exceeded each of the listed requirements.

22. Ayres's contract was not renewed for the 2015-2016 school year.

23. While employed at CCA he consistently exceeded the expectations of his employer, received annual raises, and excellent reviews.

24. He adequately performed the essential functions of his position with the school as librarian.

25. During his eight-year employment with Cape Cod Academy, he had three inpatient hospital stays for treatment relative to his mental disability when he had an episodic flare up.

26. During these stays no one at the school knew he was receiving treatments for a mental disability.

27. Other faculty at the school believed that Ayres may have been suffering from cancer.

28. After his treatment, he would return to work and adequately perform the essential functions of his job.

29. As a full time librarian Mr. Ayres was earning $51,000 per year; he was paid in monthly installments over the course of 12 months.

30. For the 2013-2014 school year, his position was reduced to a .625 FTE librarian position, for alleged budgetary cuts, not performance related reasons, and he worked at the school receiving an annual salary of $31,824.00 paid in 12 equal monthly installments.

31. For the 2014-2015 school year, Ayres was again offered a .625 FTE librarian position with a salary of $31,824.

3

32. For the 2014-2015 a salary increase incentive was offered to all faculty in lieu of an annual raise.

33. This was to be paid as a permanent $3000 increase in salary upon completion of a professional development course offered at the school in the fall of 2014.

34. This permanent salary increase was to start being paid in January 2015.

35. Additionally for the 2014-2015 school year, Ayres was paid a $6000 annual stipend, in 12 equal monthly installments, for his additional work completed for the yearbook at the school.

36. This stipend figure was calculated based on estimated additional hours of work required by Ayres in order to complete the yearbook.

37. The school pays sports coaches approximately $3000 per sport per semester for coaching said sport.

38. This figure is calculated based on working 3 hours per day, five days per week for a ten-week period of time.

39. The estimated additional work hours for a sport coach are 150 hours based on the rate of stipend pay.

40. Based on the rate of pay, it can be calculated that the estimated work hours for yearbook are at least double that of a single semester sports coach.

41. Based on the rate of stipend pay it can be calculated that Ayres was estimated to work at least an additional 300 hours for the completion of the yearbook.

42. The work that Mr. Ayres did for CCA continued throughout the summer of 2015 until August, when the yearbook is sent for publication.

43. In January 2015, CCA fired the prior head of school and Thomas Trigg was hired to replace him.

44. During CCA's Winter break, in late December to early January 2015, Mr. Ayres received Electric Convulsive Treatment (ECT), while he was inpatient at McLean Hospital in Belmont, Massachusetts, for treatment of his mental disability.

45. His doctors believed that the ECT treatment would quickly fix his condition and after six to ten sessions he would be able to go back to work.

46. Mr. Ayres's wife, Amanda Packard, who also worked at CCA, requested FMLA leave on his behalf from the school on December 30, 2014 and again in writing on January 6, 2015.

47. The school denied this FMLA leave request for Benjamin Ayres.

48. No explanation was provided for this denial.

49. FMLA requires 1250 hours in 12 working months, or .6 FTE in order to be eligible.

50. Ayres exceeded the number of hours based on his contracted for .625 FTE.

51. Ayres further exceeded the 1250-hour requirement based on his additional hours as required under the yearbook work and stipend.

52. The ECT does have associative short-term memory loss as a side effect, but otherwise it was very effective and Mr. Ayres produced a doctor's note and returned to work on March 10, 2015.

53. On March 22, 2015, Mr. Ayres's doctors decided to change his medication to an MAOI inhibitor. As a result of this decision, and the potential lethal side effects of a medication change if not done properly, Mr. Ayres returned to McLean Hospital for an anticipated two-week stay to change his medication.

54. None of Ayres' supervisors or the human resources departments at CCA had knowledge of Mr. Ayres mental condition until March 24, 2015.

55. On March 24, 2015 Mr. Ayres's wife, Amanda Packard, notified the Headmaster of the School, Tom Trigg, that her husband, Mr. Ayres, was suffering from a mental illness and explained that he had been readmitted to McLean Hospital for a medication change for treatment of his disability.

56. Mr. Ayres's wife notified his supervisors including Tom Trigg, that Mr. Ayres would be able to return to work, with a doctor's note, within a few weeks of his medication being changed.

57. Mr. Ayres was terminated from his librarian position ten days after the school learned that he was suffering from a mental disability.

58. The Librarian position, is the only position Mr. Ayres held at the school that required him to come into contact with students, parents, and other faculty on a daily basis at the school.

59. Ayres has suffered from and been treated for his disability by the same psychiatrist, Dr. Julie Callanan, since January 2012. (Please See Exhibit A that indicates Mr. Ayres was not fully aware of his termination until after Labor Day 2015 when other teachers returned to work and he did not.)

60. Despite suffering with this disability for a majority of his adult life, Ayres is often able to

coordinate any necessary hospitalization in conjunction with school vacations, so he has been able to perform his job without needing any accommodations from his employer.

61. After they were notified that Ayres was suffering from a mental disability, the school, by and through Tom Trigg, requested a Power of Attorney from Mr. Ayres's wife, Amanda Packard.

62. A Power of Attorney was executed, while Mr. Ayres was inpatient at the hospital, on Easter Sunday, April 5, 2015.

63. On April 6, 2015, without notice to Benjamin Ayres or his wife, Mr. Ayres's librarian job was posted on the Cape Cod Academy website.

64. Mr. Ayres's wife produced the Power of Attorney to Tom Trigg during a meeting with him on April 6, 2015 after Mr. Ayres's librarian position had already been posted on the website.

65. At this time the school stopped paying Ayres the contracted for 12 equal installment checks relative to the $31,824.00 he received for work as a librarian.

66. Mr. Ayres was not notified directly that he no longer had a librarian position.

67. Neither, Mr. Ayres nor Amanda Packard were given the opportunity to explain when he would be able to return, or asked if he needed an accommodation.

68. Neither, Mr. Ayres nor Amanda Packard were given an explanation for the effective termination that occurred while he was suffering from a disability and had requested FMLA leave.

69. That evening, on April 6, 2015, the new headmaster, Tom Trigg, called Ayres's wife, Amanda Packard and left her a voicemail (available upon request) apologizing for the way the situation was handled, stating that it was an error.

70. On April 7, 2015, notes from McLean hospital state, "[Patient] to have meeting with wife and case manager on 4/9/15 to discuss [patient's] job loss and make a plan for [patient] [suicide prevention] [discharge] in light of this change."

71. On April 9, 2015 Mr. Ayres was notified by his doctors and Ms. Packard that he had been terminated from the school, however due to the effects of the ECT treatment he had received which caused short term memory loss he was not able to understand or process the news of his termination.

72. His inpatient stay was extended as a result of his having a setback in his recovery from the news.

73. The reason for the extended inpatient stay was that Ayres was not able to fully comprehend

the news of his termination. At first he needed to be retold daily.

74. Mr. Ayres continued to not comprehend the termination for months because he was not at the school when the termination occurred so he was not able to grasp that this was a permanent termination.

75. The Neurology notes from McLean hospital on April 10, 2015 states, "contract for work will not be renewed next year. The wife of the patient is aware of this, but the patient is not."

76. On April 13, 2015 an email is sent to the faculty stating that Ben "may retire" next year. (Please see Exhibit B)

77. On April 16, 2015, the headmaster wrote a very personal handwritten letter to Mr. Ayres stating "While you have been away, people have told me how much I will enjoy getting to know you" and "There is so much I have to look forward to in my new life on the Cape and at CCA, and I hope you will be a part of that." (Please see attached Exhibit C).

78. No one was hired to replace Mr. Ayres at this time.

79. This letter, the voicemail stating the position being posted was an error, and the email to faculty led Mr. Ayres, and his wife, to believe that he would be welcome back to work.

80. Through August 2015, Ayres continued working from home for CCA on the yearbook project. He continued to receive his monthly installment checks for payment of this work.

81. Progress notes from McLean hospital dated April 21, 2015 indicate that "[p]atient was unclear as [sic] whether he has definitely lost his job-states that it was something his wife said." (Please see attached Exhibit D)

82. On April 26, 2015 Mr. Ayres was released from his inpatient stay at the hospital. However, he was, and still to some extent is, suffering from some of the ECT memory loss side effects and he did not understand that he had permanently lost his job.

83. Because of this memory loss, Mr. Ayres needed to be told repeatedly that he had been terminated from the school.

84. This exacerbated Ayres mental health condition.

85. The written documentation Ayres saw, from the faculty email indicating he may retire, to the handwritten letter from the headmaster, stating that the headmaster looked forward to working with him at the school, coupled with Ayres' continued work on the yearbook, indicated to him that he still had a job and increased his confusion and lack of understanding.

7

86. Because of his disability and the confusing statements and actions of the Head of School, Trigg, Ayres did not fully comprehend that he was no longer welcome at the school.

87. In fact, Mr. Ayres did not think anything was much different at all because he continued to work for the school from home on the yearbook through August 2015.

88. Further, no one was hired to fill his position at the school while all of this was happening.

89. Thereafter, in July Ayres began receiving disability payments through social security to cover the loss of part of his paycheck.

90. Mr. Ayres continued from March until August to work on and complete the yearbook for the school from home.

91. He attended graduation with his wife and took photos for the yearbook.

92. Ayres continued to work for the school until August 18, 2015, after his last paycheck.

93. On August 15, 2015, Mr. Ayres received his last stipend check for the yearbook work.

94. CCA hired a new librarian on August 28, 2015.

95. Ayres was replaced with a younger, less qualified individual.

96. Ayres was not offered the position prior to it being filled.

97. The first time that Mr. Ayres had a full understanding that he had been terminated from his position with the school was after school was back in session on September 8, 2015, after the Labor Day weekend-- when his wife and the other teachers went back to work, and he did not.

98. At this time, Mr. Ayres was finally able to fully understand, process, and remember that he was terminated from his position with the school and would no longer be working. It was at this time that he had a reasonable understanding that he had lost his job and had been replaced by a younger woman.

99. This delayed understanding was a direct result of the short-term memory loss associated with the treatment he had received in January for his disability.

100. To date, no one from the school has ever stated to Mr. Ayres that he was no longer working at the school, not verbally or in writing, despite receiving handwritten letters/notes from the headmaster, and faculty and staff members having knowledge that he could be contacted.

101. During all times relevant hereto CCA was, and continues to be, a member of the National Association of Independent Schools (hereinafter "NAIS").

102. CCA advertises itself as such on its website.

103. In order to be a member of NAIS, a school must adhere to the National Association of Independent Schools Principles of Good Practice (hereinafter NAIS Principles) that CCA advertises adherence too.

104. Membership in the NAIS is contingent upon agreement to abide by the NAIS Principles.

105. One of the NAIS Principles in regards to the Hiring Process requires that "Current staff are aware of openings."

106. Trigg did not notify Ayres that there was an opening for a librarian.

107. Tom Trigg did not consider Ayres for the position, even though Ayres was more qualified than the younger individual that was hired to replace him.

108. The NAIS Principles also state "When a faculty member's future in the school is in question, the supervisor devotes sufficient attention and resources to ensure that the situation is resolved or that the faculty member's departure from the school is handled with attention to due process and dignity of the individual."

109. The CCA Faculty Handbook specifically articulates that a teacher can assume they have tenure for the upcoming year, provided they are performing their jobs adequately, and that there is stable or growing enrollment at the school.

110. No attention was given to Ayres.

111. No one from the school spoke to Ayres.

112. The actions of the individual Defendants are imputable to the entire Defendant Board of Trustees as each and every member of the Board knew or should have known of the actions described above.

113. The Plaintiff requested a private right to sue letter from the Attorney General's office.

114. On or about September 28, 2016, the Plaintiff requested a private right to sue letter from the Massachusetts Commission Against Discrimination.

## COUNT I
## DISABILITY DISCRIMINATION- M.G.L. 151B and ADAAA

115. The Plaintiff hereby incorporates by reference paragraphs 1-114 above as if fully set forth herein.

116. The Plaintiff, as alleged above, has been discriminated against, in violation of the Fair Employment Practices Act (G.L. c 151B), in that the above adverse employment action (by Defendant CCA) (failure to renew his employment contract) constituted unlawful discrimination on the basis of his disability.

117. The Plaintiff suffers from a diagnosed mental impairment that substantially limits one or more major life activities, including at times his ability to work, sleep, concentrate, read, and care for himself, in addition to interacting with others.

118. The Plaintiff is a qualified handicapped person because of his disability.

119. The Plaintiff was subjected to an adverse employment action (failure to renew his employment contract).

120. At the time Plaintiff was dismissed from his employment he was suffering from a qualified handicap, as he was inpatient at a hospital.

121. At the time Plaintiff was discharged from his employment he was performing the essential functions of his position.

122. At all times relevant hereto, the Plaintiff had, and continues to have, a diagnosed mental disability that he receives treatment for.

123. The Plaintiff was qualified and able to perform the essential functions of his position of upper school librarian.

124. The Plaintiff was qualified and able to perform the essential functions of his position as editor of the yearbook.

125. The Plaintiff was suffering from a serious health condition.

126. That serious health condition resulted in the Plaintiff having a disability.

127. The Plaintiff was not offered a reasonable accommodation.

128. The Plaintiff was terminated from the part of his employment where he was required to be present at the school.

129. Plaintiff was terminated 11 days after Defendant CCA, by and through Defendant Tom Trigg was notified that Ayres was suffering from a mental disability.

130. Plaintiff was terminated from the other part of his employment upon completion of his work.

131. Plaintiff's position remained open until August 28, 2015 when Defendant CCA filled it.

132. As a direct and proximate result of Defendant CCA's and Defendant Trigg's unlawful discrimination as set forth above, Plaintiff has suffered lost wages, benefits, and loss of employment opportunities, as well as substantial damages for pecuniary losses, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

## COUNT II
## AGE DISCRIMINATION – ADEA

133. The Plaintiff hereby incorporates by reference paragraphs 1-132 above as if fully set forth herein.

134. The Plaintiff, as alleged above, has been discriminated against, in violation of the Age Discrimination in Employment Act (ADEA) in that the above adverse employment action (failure to renew his employment contract) constituted unlawful discrimination on the basis of age.

135. The Plaintiff was 60 years of age at all times pertinent to the allegations contained above and thus was/is a member of the protected category.

136. The Plaintiff was subjected to an adverse employment action (failure to renew his employment contract).

137. The Plaintiff was qualified for the position of an upper and lower school librarian.

138. The Plaintiff was qualified for the position of yearbook editor.

139. The Plaintiff was replaced by a younger person.

140. Plaintiff's replacement was and is less qualified than the Plaintiff.

141. Defendant CCA, by and through Defendant Tom Trigg hired a younger replacement for Plaintiff.

142. As a direct and proximate result of Defendant CCA's and Defendant Tom Trigg's unlawful discrimination as set forth above, Plaintiff has suffered lost wages, benefits, and loss of employment opportunities, as well as substantial damages for pecuniary losses, mental anguish, loss of enjoyment of life, and other nonpecuniary losses

## COUNT III
## BREACH OF CONTRACT

143. The Plaintiff hereby incorporates by reference paragraphs 1-142 above as if fully set forth herein.

11

144. The Plaintiff was offered a contract by the Defendant CCA.

145. The Plaintiff accepted the offer.

146. Plaintiff performed and continued to perform his duties under that contract.

147. The Plaintiff was working under the contract and being paid by the Defendant CCA in accordance with that contract.

148. The Defendant CCA ceased paying the Plaintiff without notice

149. The Defendant CCA terminated the Plaintiff without notice.

150. The Defendant CCA terminated the Plaintiff without justification.

151. The Plaintiff and the Defendant CCA had a valid contract.

152. The contract required Plaintiff to be paid for 30 days after termination.

153. Defendant CCA did not pay Plaintiff in accordance with the contract.

154. The Defendant CCA breached that contract.

155. The Plaintiff failed to comply with its own policies in the faculty handbook and with the NAIS principles.

156. The Plaintiff has suffered and continues to suffer damages as a result of the Defendant CCA's conduct.

### COUNT IV
### VIOLATION OF FMLA- 29 U.S.C. 2617

157. The Plaintiff hereby incorporates by reference paragraphs 1-156 above as if fully set forth herein.

158. The Defendant CCA is an employer who is governed by and covered under the Family and Medical Leave Act.

159. The Plaintiff was an employee of the Defendant CCA who is eligible for the Family and Medical Leave Act.

160. The Plaintiff worked for the Defendant CCA.

161. The Plaintiff worked for the Defendant CCA for the prior 7 years including the preceding 12

months.

162. The Plaintiff is a covered employee.

163. The Defendant CCA has 50 or more employees.

164. The Plaintiff was suffering from a serious health condition.

165. The Plaintiff was receiving inpatient care in a hospital.

166. The Plaintiff, by and through his Power of Attorney and Wife did request FMLA leave in writing.

167. The Defendant CCA failed to provide the Plaintiff with a Notice of Eligibility Rights and Responsibilities form (Form WH-381).

168. The Defendant CCA failed to provide the Plaintiff with a Form WH-381.

169. The Plaintiff's personnel file does not contain a Form WH-381.

170. The Defendant CCA failed to provide the Plaintiff with a Form WH-382

171. The Defendant CCA failed to give the Plaintiff the requested medical leave under FMLA.

172. The Defendant CCA did terminate the Plaintiff from his job during the 12-week period that the Plaintiff had requested FMLA leave.

173. The Plaintiff has suffered damages as a result of Defendant CCA's conduct in denying him FMLA leave.

174. The Plaintiff has suffered damages as a result of Defendant CCA terminating him during the period of time that he had requested FMLA leave.

## COUNT V
## RETALIATION

175. The Plaintiff hereby incorporates by reference paragraphs 1-174 above as if fully set forth herein.

176. The Plaintiff, as alleged above, has been discriminated against, in violation of the Fair Employment Practices Act (M.G.L. c 151B) in that the above adverse employment action (by Defendant CCA and Defendant Tom Trigg) (failure to renew his employment contract) constituted unlawful discrimination on the basis of his disability.

13

177. The Plaintiff suffers from a diagnosed mental impairment (serious medical condition) that substantially limits one or more major life activity, including at times his ability to work, sleep, concentrate, read, and care for himself, in addition to interacting with others.

178. Defendant CCA, by and through Defendant Tom Trigg, terminated Plaintiff upon learning of his diagnosed mental impairment.

179. The Plaintiff, by and through his power of attorney and wife, did request FMLA leave.

180. The Plaintiff did request a reasonable accommodation in asking for FMLA leave.

181. After Plaintiff's request, he was terminated from his employment position by Defendant CCA.

182. Requesting reasonable accommodation is a protected activity.

183. Plaintiff is not a "key employee" as defined as an exemption.

184. Defendant CCA would not suffer an undue hardship by allowing Plaintiff to take the requested FMLA leave for medical treatment.

185. Defendant CCA did not hire a replacement for Plaintiff until on or about August 28, 2015.

186. As a direct and proximate result of Defendant CCA's and Defendant Tom Trigg's unlawful discrimination as set forth above, Plaintiff has suffered lost wages, benefits, and loss of employment opportunities, as well as substantial damages for pecuniary losses, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

## COUNT VI
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

187. The Plaintiff hereby incorporates by reference paragraphs 1-186 above as if fully set forth herein.

188. The actions stated above constituted extreme and outrageous conduct on the part of the Defendants CCA and Trigg and were beyond all possible bounds of decency.

189. The Defendant CCA ceased to pay the Plaintiff during the time that he was inpatient at a psychiatric hospital receiving treatment for his diagnosed mental disability.

190. The actions of the Defendants CCA and Trigg were intentional and/or reckless, and were designed to inflict emotional distress on the Plaintiff.

191. The Defendants CCA and Trigg denied the Plaintiff's FMLA requests.

192. Further the Defendants CCA and Trigg knew, or should have known that severe emotional distress was likely to result from their actions in terminating the Plaintiff while he was inpatient at a psychiatric hospital.

193. The distress was severe and of a nature that no reasonable person could be expected to endure.

194. Receiving letters from Defendant Trigg complementing the Plaintiff's work after Defendant CCA terminated Plaintiff caused severe distress.

195. The Defendants' actions resulted directly in the Plaintiff's distress.

## COUNT VII
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

196. The Plaintiff hereby incorporates by reference paragraphs 1-195 above as if fully set forth herein.

197. The Defendant CCA and Defendant Tom Trigg were negligent in terminating the Plaintiff from his employment while he was inpatient at the psychiatric hospital.

198. The Defendant CCA's and Defendant Tom Trigg's negligence caused the Plaintiff to suffer emotional distress, including an extended stay at the hospital, an updated suicide prevention plan and an updated discharge plan.

199. That emotional distress caused the Plaintiff to suffer actual physical harm.

200. That physical harm was manifested by objective symptomology and is supported by medical testimony and doctor's records, including, but not limited to: loss of sleep, extended inpatient hospitalization, and anxiety.

201. The distress the Plaintiff suffered was reasonably foreseeable.

202. The Plaintiff did suffer damages as a result of Defendant CCA's and Defendant Tom Trigg's conduct.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays that this Honorable Court enter judgment in favor of the Plaintiff, award all fees, costs, and attorney's fees to the Plaintiff, award front pay, back pay, emotional distress damages and punitive damages to the Plaintiff, and enter any other judgment this Honorable Court deems fit.

Dated October 17, 2016

Respectfully Submitted,
Benjamin W. Ayres II,
By his Attorney,

Jenny L. Margeson
800 Main Street, 2nd Floor
Post Office Box 1427
East Dennis, MA 02641
(508)237-7840
BBO# 679611

Under oath I, Benjamin W. Ayres II do hereby swear and depose, that the facts included in this complaint are a true and accurate description of the events, to the best of my knowledge.

Benjamin W. Ayres II

16

# EXHIBIT A

Julie Callanan, MD
Adult Psychiatry
22 Steeple Street, Suite 202
PO Box 2076
Mashpee, MA 02649

(508)-364-3366
(508) 681-8408 (fax)

August 12, 2016

To whom it may concern:

I am writing regarding Ben Ayres (Date of Birth: 11/08/1954).

Benjamin Ayres received electrconvulsive therapy (ECT) at McLean hospital from 12/2014-04/2015 due to severe depression. His treatment was prematurely terminated in April due to severe cognitive impairment. He suffered from both anterograde and retrograde amnesia and on the advice of a Neurologic Consultation the treatment was discontinued to allow time for the ECT-associated encephalopathy to improve. Following his hospital discharge, Ben continued to suffer from severe cognitive deficits. Memory loss is not an unusual side effect of ECT and is well documented. Treatment is however usually continued to remission of depressive symptoms unless the impairment is noted to be severe. Unfortunately due to this severe impact on his memory, Ben's treatment was terminated and he continued to struggle with severe depression and cognitive impairment throughout the summer of 2015. During this time he worked on the Cape Cod Academy school yearbook and appeared to believe he still had a job, despite hearing from his spouse that his position had ended. In September when Ben did not return to work with his wife and the other faculty, and with the slow improvements in his cognition, he began to understand and retain the concept that his employment had been terminated. Losing his job, significantly impacted the course of Ben's illness. Being able to work, and resume normal life activities, is a crucial component for achieving wellness when someone struggles with a depressive illness. Being out of work left Ben without the usual social supports, structure, and feelings of accomplishment which help someone to recover. Unfortunately Ben has not returned to the baseline level of functioning which he achieved following his other periods of depression and he is now fully disabled. In all of the prior periods of illness he was able to return to work before he was fully recovered and by re-engaging with society he was able to reach full remission of his illness. Unfortunately with the termination of his employment during his last exacerbation this has not been the case.

If you have any further questions or concerns, please do not hesitate to contact me.

Sincerely,

Julie Callanan, MD, PhD

# EXHIBIT B

**Subject:**   Fwd: sharing personnel updates with parents

**From:**   Amanda Packard (apackard@capecodacademy.org)

**To:**   jmargesonesq@yahoo.com;

**Date:**   Tuesday, August 16, 2016 2:23 PM


Sent from my iPhone

Begin forwarded message:

> **From:** <dayres@bidmc.harvard.edu>
> **Date:** April 14, 2015 at 7:21:36 AM EDT
> **To:** <apackard@capecodacademy.org>
> **Subject: RE: sharing personnel updates with parents**
>
>
> got it   how was he Sun and Mon?
>
> ────────────────────────────
> From: Amanda School [apackard@capecodacademy.org]
> Sent: Monday, April 13, 2015 10:12 PM
> To: Steve Ayres; Ayres,Douglas; Heather W.; Caroline Ayres; Emily; Sarah Ayres; David Ayres
> Subject: Fwd: sharing personnel updates with parents
>
> You can skip to the Ben part. This is going out to all families tonight. He knows nothing about it so please don't tell him.
>
> Amanda
>
> Sent from my iPhone
>
> Begin forwarded message:
>
> From: Tom Trigg <ttrigg@capecodacademy.org<mailto:ttrigg@capecodacademy.org>>
> Date: April 13, 2015 at 7:11:07 PM EDT
> To: ".All Staff and Faculty"
> <faculty_admin@capecodacademy.org<mailto:faculty_admin@capecodacademy.org>>
> Subject: sharing personnel updates with parents
>
> Dear CCA colleagues,
>
> Last week we spoke about some personnel changes when we gathered in the library. I asked you to keep the news of those changes among us until I had prepared a message for parents. Tonight I will be sending the update (copied for you at the end of this message) to all CCA parents. It contains the same substance as you heard last week, with one further update regarding Shannon: I told you last week that Shannon had asked a few weeks ago to step away from her role as

Director of Admissions as of this July in order to regain a healthier balance in her life as parent, spouse and professional. Today, however, Shannon met with Mary Jane and me to say she would like to step-down immediately. I respect her reasons for this and have begun plans to work with an ad hoc group of colleagues and parent volunteers to see the current admissions season into the hands of a new full-time director of admissions this summer. You'll be happy to know that Chloe, Emma, and Don all will remain at CCA for the remainder of the year.

Dear CCA Parents,

On a very irregular basis, I write a brief "community update" to my CCA faculty & staff colleagues in which I share news such as whether a colleague is going to be away for a daughter's wedding, if someone is recovering after an illness, etc. More recently, I have been sharing updates about bigger life changes or changing roles and I thought you might like to know some of this news.

Recuperations:

Dorothy Wyeth (MS English and math) has returned to teaching as of today. Her recovery from surgery has been smooth, and she even came in for our admissions Open House this weekend!

Irene Santos (MS/US health and PE) is relieved to be out of a cast and enjoying the relative freedom of a "boot." She still hopes to be back to her teaching role in early May.

Retirements:

Both Diane Jones (US Spanish) and Mary Pat Vogt (US math) told Cathy Cetta this winter that they would like to retire at the end of the year. I am sad that we will lose their talents and unselfish commitments to CCA, their students and the positive spirit of the faculty community.

We have already completed a successful search for Diane's full-time replacement, a woman with 10 years' experience teaching both middle and upper school Spanish--beginner through AP. Mary Pat's teaching load, at this point, looks as though it will be absorbed largely by colleagues with an additional section or two perhaps taught by a part-time hire.

More recently, we learned that Ben Ayres (MS/US Librarian), who has been on medical leave since December, may be retiring in the coming year.

We are keeping Ben's plans in mind as we begin the process of redefining the roles of library/technology/research/ spaces and resources in the future of our libraries at CCA. We are committed to our book collections and the student experiences of library spaces but also wondering what we could do to improve the spaces and how the professional roles of librarian

and technology integrators could work in synergy. Meanwhile, the LS library is starting to come back to life this spring with the help of LS teachers collaborating with parent volunteers.


Other Departures:

We also learned this month that Aaron Crowell '86 (MS/US science) will be leaving at the end of the year for a position in a larger, public school system, something he began looking for last year. I have tried hard to persuade Aaron to stay with this community and institution--a place he loves and has helped shape for most of the last 30+ years. As you can imagine if you know him, he has been very deliberate about this life decision--giving great priority to his family's needs even as he respects the desires of CCA to keep him here because of his great contributions to the lives of students and colleagues--both in the classroom and on playing fields. I'm happy to report that we've already had some promising candidate interviews in the search for Aaron's science department replacement.


Shannon Mott has stepped down as Director of Admission. Shannon began her work at CCA when she was asked to take on communications and marketing as a mid-year hire in November 2012. Last January, she was asked to also lead admissions--on top of communications and marketing--an overwhelming load in two areas that are crucially important to CCA's vitality. Shannon has given tremendous time and effort to her work but told me last week that she has decided she needs to rebalance her life for the health of her family. We will work with an ad hoc group of colleagues and parents to see the current admissions season into the hands of a new full-time director of admissions this summer.


Last week, Lower School Dean Barb Goydas met with LS faculty to let them know she has been reflecting on her first year in an administrative role and has determined she will not be returning next year. I have admired the self-confidence, good humor, and professional perspective that Barb has exhibited as she explains that she just hasn't felt "the fit," as she put it, between her talents and skills as a long-time teacher and support specialist and the roles of the administrator guiding and leading a division. I have begun work with the LS faculty to define the leadership qualities and priorities that will shape our search for a new dean.

Among the search priorities will be expertise in early childhood developmental science, an ability to articulate and lead toward a vision for LS education, the emotional and practical skills to mentor faculty and work with parents as partners.


The last update is actually old news, but I never shared it explicitly in broadcast:


This January, when we learned Ginny Irving would be leaving her Annual Fund role in the development office and we decided we wouldn't fill her position, I asked Michelle Lifton '89 to shift her focus to work on alumni relations and alumni events, the alumni giving to the Annual Fund, and community outreach and event-driven marketing that gets CCA--both our name and our people--out into the Cape community.

I am hopeful that Michelle's work can help CCA evolve toward having more active alumni engagement with their school. CCA has a lot of work to do in order to mature in this area which is so basic to the health of an independent school, but the fruits will be great:

* more active presence of alumni in the consciousness of current students--thus shaping new graduates' understanding of what it means to be an alumnus;

* promoting alumni interest in the well-being and future of the school;

* increased giving to the Annual Fund--something that needs to support more of the costs of sustaining the institution for future generations.

Related to Michelle's move and our playing "man down" since Ginny's departure, I have asked Jean McCutcheon (Dir. of Development) to focus more on parent and past parent relations and successfully closing the the Annual Fund in the coming months. Our major gifts work is being relegated to trustees and me.

Over the course of the next few weeks and perhaps months I will share with you other shifts in staffing arrangements if/as they unfold. As I said in my recent letter to parents and remarks in public gatherings, we are committed to preserving and strengthening student and parent experiences at CCA even as we look hard at ways we can improve our management of expenses, especially on the administrative side.

This message is intended for the use of the person(s) to whom it may be addressed. It may contain information that is privileged, confidential, or otherwise protected from disclosure under applicable law. If you are not the intended recipient, any dissemination, distribution, copying, or use of this information is prohibited. If you have received this message in error, please permanently delete it and immediately notify the sender. Thank you.

# EXHIBIT C

April 16, 2015

C A P E   C O D   A C A D E M Y

THOMAS F. H. TRIGG
Head of School

Dear Ben,

I was feeling I needed a ~~break from administrative head~~ ~~aches~~ ~~after~~ ~~stepping~~ ~~into~~ picked up a copy of "Current" left in the reception area. As I perused I thought about the importance of CCA having such a magazine : it's not just ~~that we~~ showcase good writing but that we give students an opportunity to create something real as a team and we ~~say~~ writing is important and edifying and worthy of sharing.

I've learned that it was you who created "Current." Thank you, Ben. This is a gift to your students and the school.

While you've been away, people ~~have told me~~ I will enjoy getting to know you. We have much in common: a love of language and for helping kids with their writing (and ideas), a love of books, and the hobbies of golf and tennis. I am looking forward to the days when we will be able to play some golf together if you'd like that.

CAPE COD ACADEMY

THOMAS F. H. TRIGG
Head of School

Last night I was
reading something about Jessica
Lahey and it reminded me that
it was you who ~~connected with~~
her ~~before~~ ~~she~~
was famous. Amanda told
me it was also you who helped
CCA build a relationship with
Stanley Kowalski. I admire
the way you have chosen to
engage your mind with public
intellectuals and their speaking
events. CCA has benefited
from your example as a life-
long learner.          ⟶

4/ Our new French teacher Lindsay Oliver and I were chatting last week about our common love of leading student travel adventures. I've ~~taken students to Russia~~ and to ~~the Pacific Northwest for~~ three weeks of camping. I've heard you have a similar history with student biking treks. I'll look forward to hearing stories from your trips.

There is so much I have to look forward to in my new life on the Cape and at CCA. I hope you'll be a part of that.

Sincerely, Tom

# EXHIBIT D

Apr. 13. 2015  8:17AM                                            No. 9242   P. 4



**McLean**Hospital  a Harvard Medical School affiliate
115 Mill Street, Belmont, MA 02478  617-855-2000

## NEUROLOGY CONSULTATION
### Neuropsychiatry and Behavioral Neurology (NBN) Service

Name: Ayres,                                    Requesting Attending:
Benjamin                                        Geida, Steven
MRN: M176652
DOB: 11/08/54
Evaluation Date:
4/16/15
Location
ABB-110B

years. His job hours were cut 2 years ago, due to budget cutbacks, so he works part-time and he went back to work 1 week ago but is not functioning at work. His wife works in the same school as he does. He denies physical, sexual or emotional abuse hx.

- Notably, patient has received mail during this admission that his contract for work will not be renewed this year. The wife of the patient is aware of this, but the patient is not.

## PHYSICAL EXAM

VS            P: 74         BP: 122/76     RR: N/A      T: 98.2
General       Well nourished, in no apparent distress
HEENT         NCAT, sclerae clear, no corneal discoloration, no pharyngeal erythema
Chest         Clear to auscultation bilaterally
CV            S1S2, no murmurs/rubs gallops
Abdomen       Soft, nontender, normal bowel sounds
Skin          +ruddy color of neck and chest, + psoriasis plaque on left elbow

## MENTAL STATUS EXAM

| | |
|---|---|
| Appearance | Wearing PJ pants, T-shirt, and hoodie. Moderate hygiene, dressed appropriately. Fair eye contact |
| Behavior | Calm and cooperative, + psychomotor agitation in beginning of exam with swinging of legs back and forth, improved during interview |
| Speech | Paucity of words at times, + increased latency prior to starting sentence/response. Once started, normal rate, rhythm, tone. |
| Mood | "a bit depressed" |
| Affect | Dysphoric, restricted |
| Thought Process | Possibility of thought-blocking, although after long pauses in speech, would pick up on same topic. |
| Thought Content | No SI/HI. No evidence of paranoia or obsessions. |
| Perception | Denied AH, VH; no perceptual abnormalities noted |
| Insight | Reduced |
| Judgment | Reduced |

## COGNITIVE EXAM
Level of Consciousness: Alert
Cognitive Function
- Digit Span: Forward 5/ Backward 3
- MoCA Score: 23/30
- Frontal Assessment Battery: 13/18
- Orientation: Oriented to place, date, day, time, and person

Evan D. Murray, M.D.
Department of Neurology
McLean Hospital

McLEAN HOSPITAL
PROGRESS NOTES

MRN 176652 VIS 1324525
AYRES, BENJAMIN
AKA
DOB 11/08/54   ABE
READM 03/23/15   M

Page II

No.          Name

---

**4/21/15 2145 cont.** ...is difficult to continue to be here. However, pt. was unclear as to whether he had actually lost his job - states that it was something his wife said. Pt. attended music therapy & fitness ctr. Visible, social, denies safety concerns. Will come to staff with As.
— Sam Copeland, MHS

**April 22, 2015 0500** Pt. slept well and is in and out through the nite. Was awaken briefly @ 0316 and fell back asleep by 0345. At present, pt. continues to sleep. — F.M. Daughtry RN / c.m. Daughtry RN

1550 rev 08/02